## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2016-NMSC-022

Filing Date: June 13, 2016

Docket No. S-1-SC-34667

STATE OF NEW MEXICO,

      Plaintiff-Appellant,

v.

MUZIWOKUTHULA MADONDA,

      Defendant-Appellee.

INTERLOCUTORY APPEAL FROM THE DISTRICT COURT OF QUAY COUNTY
Albert J. Mitchell, Jr., District Judge

Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Santa Fe, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Justice.**

**{1}** Defendant Muziwokuthula Madonda (Defendant) was interrogated following his arrest for the murders of two men in Tucumcari, New Mexico. At the outset of the interrogation, law enforcement officers advised Defendant of his *Miranda* rights, and he unequivocally invoked his right to remain silent and his right to counsel. However, the officers continued to interrogate Defendant, and Defendant eventually made incriminating statements. Defendant then moved pretrial to have the statements suppressed, arguing that they were obtained in violation of the prophylactic rules announced in *Miranda v. Arizona*,

1

384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477 (1981). The district court granted Defendant's motion to suppress the statements, and the State, in turn, filed this interlocutory appeal. Because we hold that the officers failed to scrupulously honor Defendant's invocation of his *Miranda* rights, we affirm.

## I.      BACKGROUND

**{2}**      On March 24, 2011, the New Mexico State Police were called to the Tucumcari Inn after a relative found Bobby Gonzales and Gabriel Baca dead in the bathroom of room number 126. The investigation, headed by New Mexico State Police Agent Josh Armijo, led law enforcement to suspect Defendant had committed the murders. Relying in part on information provided by Defendant's former employer, Texas Rangers assisted the New Mexico State Police in locating and arresting Defendant near Houston, Texas, on March 27, 2011. After his arrest, Defendant's van was impounded and he was transported to the Montgomery County Sheriff's Office in Conroe, Texas.

**{3}**      Defendant was questioned by law enforcement on three separate occasions following his arrest. The first interrogation attempt occurred shortly after the arrest, at approximately 1:00 a.m., and was conducted by Texas Rangers Steven Rayburn and Jason Taylor. During this interview, Defendant told the Rangers, "I will not talk," invoking his right to remain silent. At that point, the Rangers did not attempt to further interrogate Defendant concerning the murders but did continue conversing with Defendant about what would happen to his van and other belongings. Ranger Taylor asked Defendant for his consent to search Defendant's hotel room, which Defendant gave. Ranger Taylor then explained that the officers would take an inventory of the contents of Defendant's van and asked if Defendant would give the officers permission to conduct a search of the vehicle. Defendant asked why the officers needed his permission if they were going to search the van anyway, and Ranger Taylor explained that officers conducting a search might "look a little deeper" because they would be looking for evidence of criminal activity, not just creating an inventory of Defendant's belongings. Defendant refused to consent to the search of his vehicle. He did, however, ask the Rangers if he could have his Bible, which was in the van. Ranger Rayburn explained that he would have access to a Bible at the jail, but Defendant expressed that he preferred his own Bible, which was easier to read because it had all his notes and markings in it. Ranger Rayburn explained that he was not sure if Defendant would be allowed to have his own Bible inside the jail and that someone else would make that decision after the inventory of the vehicle. The conversation ended shortly thereafter and Defendant was taken to jail.

**{4}**      Agent Armijo, Sergeant Matthew Broom, and Agent Kevin Massis of the New Mexico State Police arrived at the Montgomery County Sheriff's Office the following day. While the New Mexico officers were en route to Texas, Ranger Taylor secured a search warrant for Defendant's van. After the three New Mexico officers arrived in Texas, Rangers Taylor and Rayburn briefed them regarding the previous interview attempt. Ranger Rayburn specifically advised the New Mexico officers about Defendant's request for his Bible because of the "possible significance" of the notes Defendant had written inside it. Agent

2

Armijo and Sergeant Broom spent approximately thirty minutes discussing their plan for interviewing Defendant. They determined that they needed Defendant's Bible for the interview, so they instructed Agent Massis, who was conducting the search of Defendant's van, to locate and provide it to them prior to the interrogation. The Bible was not included on the search warrant return receipt, nor was it tagged into evidence. It was, however, numbered and photographed so the officers could keep track of it, the photograph showing Defendant's name written on the front page.

**{5}**     After receiving the Bible, Agent Armijo and Sergeant Broom met with Defendant on March 28, 2011. This second attempt to interview Defendant gave rise to the issue we address in this opinion.

**{6}**     The interrogation on March 28, 2011, took place in the same interview room as the meeting between Defendant and the Rangers the day before. Defendant, Agent Armijo, and Sergeant Broom entered the room together. The officers each carried a notebook and Agent Armijo also had a manila envelope, which he placed on the table as he entered the room. The three men sat at a table in the corner of the room with Defendant seated between the two officers. Less than a minute after entering the room, Agent Armijo advised Defendant of his *Miranda* rights, which Defendant indicated he understood. Then, the following exchange occurred:

| | |
|---|---|
| Agent Armijo: | Okay. Uh, with these rights in mind, do you uh, do you have a problem sittin' here and talking with us? |
| Defendant: | *Oh, I would like a lawyer please.* |
| Agent Armijo: | Okay, that's more than fair. |
| Defendant: | Don't know if you guys can help with that. I've been here two days and no one has told me what's going, what's going to happen or uh, I don't know and what's the wait for, what exactly . . . |
| Agent Armijo: | Okay, okay. |
| Defendant: | Yeah. |
| Agent Armijo: | Okay. Umm, so what, what, what're you saying? What are you asking me? |
| Defendant: | *I would like a lawyer. Talk to, to a lawyer first.* |
| Agent Armijo: | Okay, I understand that. But you said I, if I could help you with something. |

3

| | |
|---|---|
| Defendant: | Uh . . . |
| Agent Armijo: | With explaining to you why you're here? |
| Defendant: | No. I understand why I'm here. I don't know if you guys could help set me up with a lawyer or if it's, falls under a certain department or if you guys can handle that. That's all I'm trying to ask you. |

**{7}** The conversation continued as Defendant and the officers discussed the process for obtaining a lawyer. The officers explained that the court would likely appoint counsel at Defendant's arraignment, but the process would probably take a few days. The exchange about obtaining a lawyer took approximately one minute, after which Agent Armijo confirmed with Defendant, "You don't have anything to say is what you're telling me?" and Defendant responded, "I don't have anything to say." The parties do not dispute that by this point, Defendant had invoked both his right to counsel by saying, "I would like a lawyer," and his right to remain silent by saying, "I don't have anything to say."

**{8}** Next, Agent Armijo stood up and told Defendant, "Okay, sit tight for me for just a second." Sergeant Broom picked up the manila envelope and, at Agent Armijo's request, handed the envelope to Agent Armijo. Agent Armijo reached into the envelope, pulled out Defendant's Bible, and said to Defendant, "I just wanna double check real quick that this is yours?" Defendant confirmed that it was his Bible and that he had asked the Rangers for it. Agent Armijo then told Defendant that he could not give the Bible to Defendant because it was being seized as evidence. Sergeant Broom confirmed with Defendant that he had received another Bible in jail, but Defendant again explained that he would prefer to have his own Bible because it had all his notes and markings in it. Sergeant Broom assured Defendant that his Bible was "not going anywhere, okay? It's staying with us." Agent Armijo then turned to leave the interrogation room, but Sergeant Broom remained seated at the table with Defendant and Defendant's Bible.

**{9}** As Agent Armijo walked toward the door, Defendant stopped him to ask "one more question." Defendant asked about having the money the Rangers seized from his wallet and backpack applied to his commissary account at the jail so that he could buy warm clothes because it was very cold in his cell. Agent Armijo told him that he could not make any promises, but that he would "ask and see if they can put a rush on it." Agent Armijo then asked Defendant if there was anything else he would like Agent Armijo to tell the other officers because this would be the last time Defendant would talk to him. Defendant replied, "Mmm, no. If I could get the money so that I can get some warm clothes. That's it. That would be it. Thank you." Agent Armijo again told Defendant, "Sit tight for me," and left the room.

**{10}** After Agent Armijo's exit, Sergeant Broom remained in the interrogation room with

Defendant. A few seconds passed, then Defendant asked Sergeant Broom about the drive from New Mexico, and the two talked briefly about travel. Defendant told Sergeant Broom that his favorite part of the country to drive through was "Spring Colorado [sic]," and Sergeant Broom responded that he would "check it out."

{11}     Sergeant Broom then quickly changed the topic of conversation, drawing Defendant's attention back to his Bible by pulling it out of the envelope and asking Defendant, "You do a lot of reading?" Defendant replied, "Yes, I try," while Sergeant Broom set the Bible down on the table and began flipping through the pages. Sergeant Broom asked Defendant what his favorite verse was. Defendant laughed then asked Sergeant Broom about his favorite Bible verse, to which Sergeant Broom responded, "Philippians 4:13." *See Philippians* 4:13 (King James) ("I can do all things through Christ which strengtheneth me.") Defendant then remarked, "that's the verse I need right now," adding that the officers probably thought the case would be a "slam dunk, . . . until [they heard] what happened." Sergeant Broom told Defendant that he "would love to hear what happened" but that he could not because Defendant had requested a lawyer. Defendant said that he wished he had a lawyer already because he knew from watching crime shows on television that "it [was] dangerous to talk to [law enforcement] without a lawyer." Sergeant Broom reiterated that he would love to hear Defendant's story, but he could not unless Defendant said he did not want a lawyer after all, adding that Defendant would "say the same story" anyway, whether or not he had a lawyer present. Defendant indicated that he was conflicted about whether or not to talk to the officers, stating that he "would like somebody to hear [his] side of the story," but he was also concerned because he had heard of cases where suspects had been wrongfully convicted after speaking to police.

{12}     Agent Armijo, who had recently reentered the interrogation room, then asked Defendant, "At this point, what damage can the truth do?" Sergeant Broom and Agent Armijo then continued to use references to "the truth" to try to convince Defendant to waive his right to counsel and give them a statement. Sergeant Broom incorporated Defendant's Bible, pointing to it and saying "this right here's the truth . . . . That's what I want, is the truth." Defendant said that he "miss[ed his] Bible" to which Sergeant Broom responded, "I know." Defendant then asked questions about what would happen if he made a statement and whether it would make the process move faster. Sergeant Broom told Defendant that giving a statement would help the officers discover the truth, and Agent Armijo explained that if the truth "sen[t him] in a different direction" he would then have to "deal with" the fact that Defendant was "not [his] guy." Agent Armijo then reiterated that if the truth was that Defendant was not the killer, it did not "make sense that the truth is gonna hurt [Defendant]." Sergeant Broom then asked Defendant, "So you want to talk to me?" Defendant responded, "I'll talk, I'll talk, and maybe, . . . you know, just put the truth out there, whatever it does." Before Defendant began telling his story, Agent Armijo stopped to "make sure" Defendant understood his rights, and Defendant told the officers, "I understand I have a right not to talk, but I've decided to talk now."

{13}     Defendant gave the officers a version of events in which he was being framed for the

5

murders in Tucumcari. The officers did not believe his story and eventually ended the questioning for the day. At this point, the officers secured a promise from Defendant that he would come back and tell them the truth in the morning. The third interview took place the following morning, March 29, 2011. Defendant ultimately confessed to the murders in Tucumcari, as well as two other murders in Ohio. The State of New Mexico charged Defendant with the two Tucumcari murders.

**{14}** Defendant subsequently filed a motion to suppress his statements made during the March 28 and 29 interviews. The district court held a suppression hearing and ultimately ruled in favor of Defendant, suppressing all statements from the interviews. Because Defendant faces charges for first-degree murder, the State appealed the district court's suppression order directly to this Court. *See State v King*, 2013-NMSC-014, ¶ 2, 300 P.3d 732 (recognizing that "this Court has jurisdiction over interlocutory appeals in cases in which a criminal defendant may be sentenced to life imprisonment"). Following oral argument, we issued an order affirming the district court's suppression of Defendant's statements. We now explain the reasoning underlying our order.

## II.  DISCUSSION

**{15}** "The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted). "The appellate court must defer to the district court with respect to findings of historical fact so long as they are supported by substantial evidence." *Id.* "[W]e review de novo the district court's application of the law to those facts." *King*, 2013-NMSC-014, ¶ 4.

**{16}** Here, the district court found that during the second interview "Defendant advised the officers that he did not want to speak and requested an attorney," but the "officers continued the interview." Accordingly, the district court concluded, "The continued discussion with . . . Defendant was a violation of both his State and Federal constitutional rights to an attorney and to remain silent. All information obtained in the interviews shall be suppressed." On appeal, the State does not dispute the finding that Defendant invoked his rights to counsel and to remain silent. The State contends that the finding that the interview continued after Defendant's invocation of the right to counsel was not supported by substantial evidence, arguing that "the officers stopped the interview" and "[t]he officers did not ask any questions about the investigation or otherwise engage in any conduct likely to elicit an incriminating response until after [Defendant] brought up the investigation. . . ." We are not persuaded by the State's arguments and affirm the district court's order suppressing the statements.

**A.  The Officers Failed to Terminate the Interrogation After Defendant Invoked his Right to Remain Silent and Right to Counsel**

6

**{17}** In *Miranda*, 384 U.S. at 444, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Those safeguards include the requirement that law enforcement warn every defendant in police custody, prior to any questioning, that the defendant "has a right to remain silent, that any statement [the defendant] does make may be used as evidence against [the defendant], and that [the defendant] has a right to the presence of an attorney, either retained or appointed." *Id*. In addition, *Miranda* requires that if at any point a defendant invokes the right to counsel by indicating that "he wishes to consult with an attorney before speaking" or invokes the right to remain silent by indicating that "he does not wish to be interrogated," all interrogation must cease. *Id*. at 444-45.

> At this point [the defendant] has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut-off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id*. at 474.

**{18}** In *Edwards*, 451 U.S. 477, the United States Supreme Court "added a second layer of protection to the *Miranda* rules" with respect to the right to counsel. *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The *Edwards* Court held that when the subject of a custodial interrogation has invoked the right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484.

> *Edwards* set forth a "bright-line rule" that *all* questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"— explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.

*Smith v. Illinois*, 469 U.S. 91, 98 (1984) (alteration in original) (citations omitted). In other words, the officers must "scrupulously honor" a suspect's rights, once invoked, by ending the interrogation. *King*, 2013-NMSC-014, ¶ 8 (citing *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). "The interrogator is not at liberty to refuse to discontinue the interrogation or to persist in repeated efforts to wear down the suspect so as to cause the suspect to change his or her mind." *King*, 2013-NMSC-014, ¶ 8. Thus, in order to resolve the instant case, we must determine whether or not the officers scrupulously honored Defendant's rights by ending the interrogation.

7

**{19}** "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). This includes "repeated efforts to wear down [a suspect's] resistance and make [the suspect] change his mind" about invoking the rights described in the *Miranda* warnings. *Mosley*, 423 U.S. at 105-06. Further, in determining whether a particular act or question by an officer constitutes interrogation, courts consider evidence of the officer's intent because "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect," especially in light of "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion." *Innis*, 446 U.S. at 301-02, n.7, 8.

**{20}** The record in this case demonstrates that the officers did not properly terminate their interrogation of Defendant once he invoked his rights. After Defendant made clear that he wanted the assistance of a lawyer and that he "[did not] have anything to say," Agent Armijo brought out Defendant's Bible, which the officers had procured solely for use as an aid in the interrogation. Agent Armijo testified at the suppression hearing that he showed the Bible to Defendant only to determine whether it was in fact Defendant's; however, the officers knew Defendant had asked for his Bible the day before, they knew this was the Bible recovered from Defendant's van, they made plans to use the Bible during their interrogation, and Defendant's name was written on the front page. Based on these facts, it is obvious that clarifying the Bible's ownership was not the actual reason Agent Armijo pulled out the Bible. Rather, it appears that Agent Armijo knew the Bible was Defendant's and showed it to him to keep him talking in hopes he would make incriminating statements. Instead of immediately terminating the interrogation, as required by *Miranda* and *Edwards*, Agent Armijo employed a technique he and Sergeant Broom had specifically "designed to elicit an incriminating response from the accused." *Innis*, 446 U.S. at 301, n.7. This is contrary to the requirement that officers "scrupulously honor" a suspect's invocation of rights by ending the interrogation upon a defendant's invocation of rights. *King*, 2013-NMSC-014, ¶ 8.

**{21}** After the first introduction of the Bible, Agent Armijo left the room, stating that this would be the last time Defendant would talk to him, which suggested that the interrogation was over. However, Sergeant Broom remained in the interrogation room with Defendant and the Bible. Defendant briefly made small talk with Sergeant Broom about travel. Then, Sergeant Broom immediately brought Defendant's attention back to the Bible, asking him about his favorite verse. Under different circumstances, such a question may be innocuous. But given that the officers knew that Defendant's Bible was important to him and that they had planned to use it in the interrogation, we are convinced that Sergeant Broom instead drew Defendant's attention back to the Bible so that he could keep Defendant talking until he eventually waived his rights and gave an incriminating statement. *See Innis*, 446 U.S. at 302, n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining

8

whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response . . . .").

**{22}**    Following the reintroduction of Defendant's Bible, Sergeant Broom proceeded to try to convince Defendant that he should waive his rights and tell the officers what happened. Though Sergeant Broom's statements that he would love to hear Defendant's side of the story were not inherently coercive, they were followed by direct attempts to convince Defendant to waive his right to counsel by minimizing the importance of the right. Sergeant Broom told Defendant that he would tell "the same story" to officers without a lawyer as he would tell with a lawyer, essentially suggesting to Defendant that it would make no difference in his case whether he waited for the assistance of a lawyer or not, so he might as well just give a statement. This is an example of precisely the type of "subtle overreach" or "badgering" the *Edwards* rule was designed to prevent. *See Smith*, 469 U.S. at 98 (explaining that "all questioning must cease," otherwise through "badger[ing] or overreaching—explicit or subtle, deliberate or unintentional," officers may "wear down the accused and persuade him to incriminate himself" (alteration in original)).

**{23}**    Although Agent Armijo indicated that he would not be talking to Defendant again after Defendant invoked his rights, he reentered the interrogation room once it appeared that Sergeant Broom might get Defendant to waive those rights. Agent Armijo and Sergeant Broom then directed the focus of the conversation to the importance of telling "the truth," using the Bible as a symbol of truth. The officers' statements indicating that telling the truth could not do any harm or that it would be the most beneficial course of action for Defendant to take directly undermined the *Miranda* warnings that any statements Defendant made could be used *against him* in subsequent proceedings. *See Cuervo v. State*, 967 So.2d 155, 164-65 (Fla. 2007) (stating that officers engaged in conduct tantamount to interrogation by instructing a suspect to tell "his side of the story" because it undermined the warning that "*anything* he said could be used *against him* in a court of law").

**{24}**    Here, the officers did not honor Defendant's invocation of his rights when they failed to terminate the interrogation. Right after Defendant indicated that he wanted an attorney and did not want to make a statement, the officers proceeded with techniques they had specifically planned to employ during the interrogation, and then they undermined the very warnings which had prompted Defendant to invoke his rights in the first place. Thus, the district court did not err in finding that the officers failed to terminate the interrogation.

**B.    The Officers' Failure to 'Scrupulously Honor' Defendant's Rights Warrants Suppression of All Subsequent Statements**

**{25}**    The "fundamental purpose [of the *Edwards* rule] is to [p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel." *Maryland v. Shatzer*, 559 U.S. 98, 106 (2010) (second and third alterations in original) (internal quotation marks and citation omitted).

> [O]nce a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect."

*Shatzer*, 559 U.S. at 104-05 (second alteration in original) (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)). Thus, after a suspect invokes the right to counsel, "not only must the current interrogation cease, but he may not be approached for further interrogation until counsel has been made available to him," *McNeil v. Wisconsin*, 501 U.S. 171, 176-77 (1991) (internal quotation marks and citation omitted), or there has been a break in custody of at least fourteen days. *See Shatzer*, 559 U.S. at 105, 110. Otherwise, the statements are "inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil*, 501 U.S. at 177.

**{26}** The officers' failure to terminate the March 28 interrogation following Defendant's invocation of the right to counsel mandates suppression of the statements Defendant made during that interview as well as his statements on March 29. Because Defendant was neither provided an attorney, nor released from custody for the requisite fourteen days between his request for an attorney and the subsequent interrogation, the March 29 interview was not cured of its presumptive involuntariness. *See Shatzer*, 559 U.S. at 105, 110. Accordingly, we hold that it was proper for the district court to suppress all statements Defendant made after his initial request for counsel.

## III.    CONCLUSION

**{27}** The district court properly concluded that the officers continued to interrogate Defendant after he invoked his right to remain silent and right to counsel in violation of his constitutional rights. We affirm the district court's order suppressing Defendant's oral and video statements.

**{28}    IT IS SO ORDERED.**

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

10

_____
**EDWARD L. CHÁVEZ, Justice**


_____
**JUDITH K. NAKAMURA, Justice**

11