# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date: January 4, 2018**

**NO. S-1-SC-35245**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**JOHN N. "JACK" McDOWELL, JR.,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
George P. Eichwald, District Judge

Bennett J. Baur, Chief Public Defender
C. David Henderson, Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Laura Erin Horton, Assistant Attorney General
Santa Fe, NM

for Appellee

# OPINION

**CHÁVEZ, Justice.**

{1} Following a jury trial, Defendant John "Jack" McDowell was convicted of first-degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003). During trial the prosecutor elicited testimony from the arresting detective, without objection, that Defendant had invoked his right to counsel, and that by doing so the detective was precluded from questioning Defendant. Defendant contends on appeal that he was deprived of due process when the prosecutor elicited this testimony. We agree that the prosecutor erred. For decades, prosecutors have been prohibited from commenting on or eliciting testimony about a defendant's exercise of his or her right to remain silent, *see State v. Miller*, 1966-NMSC-041, ¶ 30, 76 N.M. 62, 412 P.2d 240 (citing *Griffin v. California*, 380 U.S. 609, 614-15 (1965)), or his right to counsel, *State v. Callaway*, 1978-NMSC-070, ¶ 10, 92 N.M. 80, 582 P.2d 1293. We review the prosecutor's error in this case for fundamental error because the error was not preserved, and conclude that the error was fundamental due to the prejudicial impact of such testimony and the lack of overwhelming evidence against Defendant. Accordingly, we vacate his convictions and remand to the district court for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{2} James Chavez died from stab wounds to his chest on July 10, 2011 in his Rio Rancho home. Shortly before his death, Chavez was cleaning his home with two acquaintances, Casey Williams and David Dinelli. Defendant, Defendant's son, and Anthony Villagomez entered the home to recover goods stolen by Chavez that belonged to Defendant's son. Villagomez carried a sawed-off shotgun, pointed it at Williams, and threw her into the garage. Dinelli ran to a bedroom, jumped out through a window, and hid underneath a truck outside the house. Defendant and his son encountered Chavez in the kitchen, where a fight ensued between Defendant's son and Chavez. According to Villagomez, who testified under a grant of immunity, after three to five minutes of fighting, Defendant approached Chavez and stabbed him. Villagomez was the only witness to testify that he saw Defendant stab Chavez.

{3} This Court has jurisdiction over Defendant's appeal under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. *See State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821. Defendant advances three grounds for reversal: (1) he was deprived of due process when the prosecutor elicited testimony about Defendant's exercise of his right to counsel, (2) Defendant's attorney was ineffective because of his hearing impairment, and (3) the district court

erred when it did not hold a hearing to determine whether the jurors accessed outside information to break their deadlock. We conclude that Defendant was deprived of due process and remand for a new trial. We do not need to address the remaining issues because the remedy would be the same—a new trial.

## II. DISCUSSION

### A. The State erred in commenting on Defendant's right to counsel

{4} New Mexico courts have long held that a prosecutor is prohibited from commenting on a defendant's right to remain silent, which is protected under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Miller*, 1966-NMSC-041, ¶ 30. Three rationales underlie this prohibition. First, the right against compelled self-incrimination under the Fifth Amendment to the United States Constitution prohibits the prosecution from "ask[ing] the jury to draw an adverse conclusion from the defendant's failure to testify." *State v. DeGraff*, 2006-NMSC-011, ¶ 8, 139 N.M. 211, 131 P.3d 61. Second, the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects post-*Miranda* silence. *Id*. ¶ 12; *see also Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976) (holding that "it would be fundamentally unfair" and a denial of due process protected by the Fourteenth Amendment to allow post-*Miranda* silence to be used in a state criminal trial "to impeach an explanation

subsequently offered at trial"). Third, as a matter of New Mexico evidentiary law, "[b]ecause silence is often too ambiguous to have great probative force and may be given improper weight by a jury, evidence of a defendant's silence generally is not admissible as proof of guilt." *DeGraff*, 2006-NMSC-011, ¶ 15; *see also State v. Lara*, 1975-NMCA-095, ¶ 8, 88 N.M. 233, 539 P.2d 623 (holding that comments on a defendant's silence were prejudicial, of minimal probative value, and would require reversal).

{5}     Similarly, eliciting testimony or commenting on a defendant's exercise of his or her right to counsel is also reversible error. *Callaway*, 1978-NMSC-070, ¶ 10; *see also United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980) ("It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel."). "Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error." *McDonald*, 620 F.2d at 564; *see also United States v. Liddy*, 509 F.2d 428, 443-44 (D.C. Cir. 1974) (noting with approval the district court's jury instruction "prohibiting the drawing of an adverse inference from the mere fact of hiring an attorney, at least when the circumstances are such that admission of evidence of such a request provokes the possibility that it will be taken

4

as self-incriminatory").

{6}     The line of questioning at issue in this case is as follows:

> Q. [The prosecutor]  After making the arrest of Jack, what did you do next in your investigation?
>
> A. [The detective] Once he was arrested, [Defendant's son] was arrested a short time later driving up to Jack's residence.  From that point, I proceeded back to the police department to conduct interviews.
>
> Q. Okay.  And -- now, after you made these arrests and after you went back to the station to conduct interviews, Jack McDowell had already invoked his right to counsel, correct?
>
> A. No.  He did that when I went to interview him in the interview room.
>
> Q. But he did invoke his right to counsel, correct?
>
> A. Yes.
>
> Q.  After that, what you know as an officer, what are you to do when someone does that?
>
> A.  Not question them in regards to what I'm investigating.

The prosecutor commented twice on Defendant's exercise of his right to counsel. As if to bring home to the jury the importance of Defendant doing so, the prosecutor elicited testimony that, as a result of Defendant's request for an attorney, the detective could not question him further—which is a comment on Defendant's right to remain silent. *See State v. Madonda*, 2016-NMSC-022, ¶ 26, 375 P.3d 424.

5

**B.      The State's error will be reviewed under a fundamental error analysis because Defendant did not preserve the issue**

{7}    We must first answer the question: what is the proper standard of review? The answer depends on whether Defendant adequately preserved the issue. To preserve an issue for review it must appear from the record that a ruling from the court was fairly invoked. Rule 12-321(A) NMRA. "Where a defendant has made a proper objection at trial, the appellate court determines whether the prosecution commented on the defendant's protected silence, and if so, reverses the conviction unless the State can demonstrate that the 'error was harmless beyond a reasonable doubt.'" *DeGraff*, 2006-NMSC-011, ¶ 22; *see Callaway*, 1978-NMSC-070, ¶ 10. If not objected to, we review for fundamental error. *DeGraff*, 2006-NMSC-011, ¶ 21.

{8}    Whether Defendant fairly invoked a ruling from the district court is difficult to ascertain from the record before us because of the less-than-ideal practices employed by both the attorneys and the judge. The prosecutor sought to introduce what was alleged to be an unsolicited statement made by Defendant while being transported to jail and after Defendant had invoked his right to counsel. However, before the detective could testify about the alleged unsolicited statement, Defendant's attorney objected. The relevant questions were as follows:

> Q. [The prosecutor]  And when he was taken into custody, did

6

you Mirandize him?

 A. [The detective] Yes, I did.

 Q. Did he make any statements to you?

 [Defendant's attorney]: Objection.

 [The court]: Counsel, approach the bench.

{9} We do not know what the basis for Defendant's objection was. At the bench conference, the judge immediately told the prosecutor to be careful because he was concerned about a mistrial. In response to the judge's concern, the prosecutor explained that he only wanted the detective to testify that Defendant made the unsolicited remark "My life is over" after he had been Mirandized and had invoked his right to counsel. At this point, the judge took a recess to excuse the jury and continue the discussion with counsel.

{10} The judge resumed the discussion by asking the prosecutor to explain what he intended to show with this line of questioning. The prosecutor repeated that he only intended to show that without being questioned by the arresting detective, Defendant stated, "My life is over." The prosecutor also offered to question the detective, who was in the witness box, about the subject. Instead of accepting the offer, the judge converted the discussion to a discovery issue by asking, "Is [the statement]

recorded?" The prosecutor said that he did not have a recording, but asked the detective whether the detective had a recording on his jump drive, to which the detective responded, "I might." The prosecutor then asked "Could we check, Judge?" to which the judge replied "Was it disclosed to defense counsel?" The prosecutor stated that the entire file was given to defense counsel. Finally, for the first time since objecting, Defendant's counsel spoke, saying that he had reviewed all of the CDs he had been given by the prosecutor and there was not a recording of the statement, that he had never before heard anything about the statement, and that nonetheless the statement was ambiguous and not Defendant's admission of guilt.

{11}    The prosecutor repeated that the entire file was produced to Defendant, who also interviewed the arresting officer, and so was at liberty to question the officer about Defendant's statements. Defendant's attorney protested, stating that he did not ask the officer about the statement "because it was never brought up," and the prosecutor "should have been forthcoming with this a long time ago, and if he had, we would have addressed this issue a long time ago." The judge interjected by stating to the prosecutor, "[Y]ou weren't even aware that there was a tape, were you?" The prosecutor said there were about 100 CDs and implied that he had recently been given the case, and in any event Defendant's attorney had an opportunity to interview the

arresting officer. Defendant's attorney retorted, "He had an opportunity to disclose it, Judge." The judge then announced that he was not going to permit the line of questioning that Defendant had made an unsolicited statement after being advised of his *Miranda* rights.

{12} However, the judge's next statement may be more relevant to the issue before this Court. The judge stated, "The other problem I have, he invoked both his right to remain silent, but he also requested counsel." The prosecutor again explained that the statements were not made in response to any questions. The judge returned to the issue of discovery, explaining that he wanted to know if there was a recording of the statement and if it had been produced to Defendant. Defendant's attorney reiterated that he had been through all of the CDs and the transcripts, and "there's nothing there."

{13} In the final analysis, we simply do not know what objection Defendant had to the question "Did he make any statements to you?" Defendant's attorney never stated the specifics of his objection, nor did the judge ask Defendant's attorney to explain his objection. The objection could not have been that the prosecutor was getting ready to comment on Defendant's exercise of his right to remain silent. A statement is not silence and the prosecutor intended to elicit testimony regarding an allegedly

9

unsolicited statement. Unsolicited statements, whether they are made before or after an accused is informed of his or her *Miranda* rights, are not protected by *Miranda*. *See State v. Fekete*, 1995-NMSC-049, ¶¶ 43-45, 120 N.M. 290, 901 P.2d 708 (noting that *Miranda* protections do not apply to statements that are volunteered, such as spontaneous statements not in response to conversation or questions from police).

{14}     Defendant's attorney later acknowledged that he was aware of Defendant's alleged statement because it appeared in a police report. Whether the statement was recorded was never developed at trial. In addition, whether an officer must have his or her recording device on at all times while in a defendant's presence was also not developed at trial.

{15}     Perhaps more enlightening was a statement made by the judge the day after the detective's direct examination, which occurred during the prosecutor's request that the district court reconsider its ruling that precluded admission of Defendant's unsolicited statement. After repeating his concern that a recording of the statement was not produced—although it may not have existed—the judge stated that he was denying admission of the statement "for the fact that as far as this [c]ourt is concerned, that recording was not made available to defense counsel." The judge then stated:

10

The other issue I have, and it may be a bigger issue that may come back to haunt you at another day, Counsel, in a case such as this, you never make any type of comments with respect to a Defendant's right to remain silent or Defendant's right to an attorney, such as, I Mirandized him, he didn't say nothing.

He Mirandized and then he said something. That's a bigger issue than the one we are talking about right here, because that may come back to haunt you at a later date.

{16} Perhaps this statement reflects the concern the judge expressed the previous day when he commented that he did not want a mistrial. The judge did not state on the record why he was concerned about a mistrial. Had the judge done so, the prosecutor would have been hard-pressed to argue that he was not on notice about the judge's specific concern. Instead, the judge made the issue one of whether a defendant's statements must be recorded and produced to the defendant before they can be admitted into evidence. The immediate issue before us is not whether a defendant's statement must be recorded before it is admissible; the question is whether Defendant objected because the prosecutor commented on Defendant's exercise of his right to counsel. Although the prosecutor should have been aware of the long-established prohibition against commenting on a defendant's exercise of his or her constitutional rights, we conclude that Defendant did not object to the prosecutor's error during the trial.

11

{17} Our conclusion is confirmed by Defendant's motion for a new trial. In his motion, Defendant alleged that the prosecutor engaged in misconduct when during his examination of Detective Romero he "began his question by inquiring about a statement by Defendant 'before he was Mirandized.'" Defendant explained that although the statement was excluded by the district court, the prosecutor's reference to Defendant's invocation of his right to remain silent was already before the jury. A generous interpretation of Defendant's motion is that he was objecting to the prosecutor having elicited testimony that Defendant invoked his right to remain silent. But even this generous reading does not establish that Defendant objected at a time when the district court could have prevented or corrected the error—for example, at the time the prosecutor asked the officer what he should do after someone invokes his or her right to counsel. *See State v. Carrillo*, 2017-NMSC-023, ¶¶ 21-23, 399 P.3d 367 (holding that the ruling of the district court must be fairly invoked to permit the court an opportunity to correct an error). Defendant did not object to the prosecutor eliciting testimony that Defendant invoked his right to counsel either during the arresting detective's testimony or in his motion for a new trial.

{18} The *DeGraff* Court explained that in the context of a prosecutor's comments on a defendant's right to silence where no timely objection is made, the Court

considers only whether the defendant has shown fundamental error. 2006-NMSC-011, ¶¶ 21-22. We will apply the same analysis when a prosecutor elicits testimony or comments on a defendant's exercise of their right to counsel. Fundamental error requires the defendant to show "a reasonable probability that the error was a significant factor in the jury's deliberations relative to the other evidence before them." *Id.* ¶ 22. We must evaluate the prejudicial effect of the testimony and the quantum of evidence against Defendant. If the prejudicial effect is minimal and the evidence of the defendant's guilt overwhelming, the error does not rise to the level of fundamental error. *Id.* ¶ 21. In this case, we review the prosecutor's error for fundamental error.

**C.  The prejudicial effect of eliciting testimony that Defendant invoked his right to counsel, which precluded Detective Romero from questioning him, was not minimal**

{19}    Detective Romero testified that he was called to the scene where Chavez was killed on July, 10, 2011. After considerable investigation Detective Romero was able to interview Catherine Chavez, Williams, Dinelli, and eventually Villagomez.

{20}    Williams, Dinelli, and all of the other witnesses who had been interviewed remained potential suspects until an arrest was made in January 2013. The prosecutor asked the detective, "[A]s an officer and as a detective, how is it that you sort of

13

knock people off of your list, so to speak, of possible suspects?" The detective answered, "You knock them off of their list by their statements." In response to questions from the prosecutor, the detective also explained to the jury that in this type of case, many of the people he interviewed were involved in the drug culture; therefore, they would not come forward to speak, so the officers had to seek them out.

{21} The detective did not interview Villagomez until after Villagomez had been arrested on federal gun charges. During the interview the detective urged Villagomez to help himself by coming clean and telling the truth. Ultimately both Catherine and Villagomez testified under grants of immunity. During closing argument, the State emphasized that Catherine testified because she wanted to "[come] clean," and Villagomez testified because he wanted "'the truth to come out.'"

{22} The contrast between the witnesses who answered the detective's questions and Defendant, who invoked his right to an attorney, was made apparent during the direct examination of the detective. The prosecutor not only questioned the detective twice about the fact that Defendant invoked his right to an attorney, the prosecutor emphasized the import of Defendant's decision by eliciting from the detective the fact that by invoking his right to an attorney, the detective could not get information from Defendant. This was the classic contrast—the innocent speak, while the guilty

remain silent.

{23} We are not persuaded that the prejudice was minimal. If reference to a defendant's invocation of his or her constitutional rights lacks probative value, reference by the prosecution to the exercise of such rights has an intolerable prejudicial impact on the jury. *See Lara*, 1975-NMCA-095, ¶ 8. What was probative about the fact that Defendant exercised his right to an attorney, and concomitantly his right to remain silent? What fact could be made more or less probable because Defendant had invoked his constitutional rights? The State has not offered any probative value for these questions, particularly since the judge prohibited the prosecution from admitting Defendant's alleged unsolicited statement.

{24} In *Callaway*, we reversed a conviction because the prosecutor focused his questions on Callaway's exercise of his rights to remain silent and to have an attorney. 1978-NMSC-070, ¶¶ 16, 18. We did so although the State argued that the questions were but a brief part of the entire trial and a curative instruction was given. *Id.* ¶ 15. We also analyzed whether the evidence of Callaway's guilt was so overwhelming that the prosecutor's improper questioning would have been harmless error. *Id.* ¶¶ 11-17. Although there was no curative instruction in this case and the questions were brief, we conclude that the prejudice from the prosecutor's improper

15

questions resulted in more than minimal prejudice. We next turn to our evaluation of the evidence of Defendant's guilt to determine whether the evidence was so overwhelming that the prosecutor's error did not rise to the level of fundamental error.

**D.      The State did not present overwhelming evidence of Defendant's guilt**

{25}      Defendant was tried as a principal and not as an accomplice. Therefore to support the first-degree murder conviction, the State needed to prove beyond a reasonable doubt that Defendant himself killed Chavez with the deliberate intention of taking away Chavez's life. *See* UJI 14-201 NMRA. To support the tampering with evidence conviction the State needed to prove beyond a reasonable doubt that Defendant destroyed or hid the knife with the intention of preventing his apprehension, prosecution, or conviction. *See* UJI 14-2241 NMRA.

{26}      Dr. Ian Paul, a forensic pathologist, testified regarding the injuries suffered by Chavez and the cause and manner of his death. Chavez suffered traumatic injuries, including a tear on the back of his head, bruises on the front part of his neck, small scrapes on the bottom of his front left abdomen, and scrapes on his left hand. Chavez had defensive wounds on the inside of his left wrist and on the third through fifth fingers of his right hand that were consistent with him grabbing a knife or defending

16

against a knife. Chavez was stabbed once in the abdomen, and twice in the chest, with one of the stab wounds penetrating a major artery of the heart which was the cause of Chavez's death.

{27} Whether Defendant or his son stabbed Chavez was disputed. The evidence gathered at the scene—shoe prints and a knife sheath found under Chavez—was not probative of Defendant's guilt.[1] Villagomez was the only witness who testified that he saw Defendant stab Chavez. However, his testimony conflicted with the testimony of Williams who was at the house when Defendant, Defendant's son and Villagomez arrived.

{28} Williams testified that three men entered the house. Two of the men were between the ages of twenty-eight and thirty-four, one of whom had long dark hair and the other with blond hair. The third person was an older man with shorter gray hair. The dark-haired man (Villagomez) took her to the garage and stood beside her holding her at gunpoint until all three men left. As she walked toward the garage, Williams saw the older man head toward the kitchen. Williams did not have a view

[1]Detective Romero testified that three or four shoe prints were taken, but that none of the prints connected to Defendant, Defendant's son, or Villagomez. He also testified that the knife sheath found underneath Chavez was submitted for "[f]ingerprint DNA analysis," but that "[t]he major DNA came back to decedent, James Chavez."

17

into the kitchen from the garage because her back was to the door. While in the garage she heard Chavez yelling in a frightened voice.

{29} After five minutes, the blond-haired man left the house, followed by the dark-haired man. Before the older man left the house, he approached Williams and told her, "Not a word." After the older man left, Williams returned to the kitchen, where she saw Chavez lying face down on the ground. She tried shaking him to get him up and heard his breathing. She then went outside the house to see if anyone could help. She returned to the house and checked on Chavez, who was no longer breathing.

{30} By contrast Villagomez testified that he, Defendant, and Defendant's son entered the home and that he encountered Williams in the house. He testified that Defendant took Williams's phone and her identification card. He and Defendant then stood there while Defendant's son fought with Chavez in the kitchen. During the middle of the fight, he took Williams into the garage and returned into the living room of the house to observe the fight. Villagomez testified that after three to five minutes of fighting, Defendant's son left the house and Defendant entered the kitchen and stabbed Chavez two or three times. He testified that after the stabbing, Defendant approached him and said, "The girl needs to go, no witnesses," to which he replied, "You got her ID and her phone. She's not going to say nothing."

{31} Catherine's testimony also persuades us that the evidence of Defendant's guilt was not overwhelming. Catherine, who was once married to Chavez but at the time was in a relationship with Defendant's son, called Defendant's son to report that cars were parked outside of the Chavez house. She waited in her car until she observed Villagomez, Defendant, and Defendant's son arrive, and she then left to her apartment. According to Villagomez, he and Defendant's son had planned to go to Chavez's house to beat him up for stealing the son's property. Villagomez obtained a gun before going to Chavez's house, but Defendant's son took it from him. When they arrived at the house, Villagomez took the gun from Defendant's son because Defendant's son looked mad. Detective Romero testified that a police report revealed Defendant's son had previously threatened Chavez with a gun.

{32} Detective Romero also testified that Defendant's son was nicknamed "Blade" because he was good with a knife and usually carried a knife. Catherine testified that as she arrived at her apartment Defendant's son called her and said, "Come back over here," and she drove back to the Chavez house. When she arrived, Defendant's son threw a knife that belonged to him into her car and told her "Get out of here." She buried the knife so that she would be the only person to find it.

{33} Catherine also testified that Defendant told her that Chavez did not have a

19

knife, that Defendant's son and Chavez fought, that Defendant's son left the room, and that Defendant stood over Chavez until he took his last breath. This latter testimony does not corroborate Villagomez's testimony that Defendant stabbed Chavez. She did not testify that Defendant told her he stabbed Chavez and stood over his body. It is equally plausible that Defendant stood over Chavez after his son stabbed Chavez.

{34} The evidence at trial was not the quantity or quality of overwhelming evidence that overcomes the prejudicial impact of the prosecutor eliciting testimony regarding Defendant's exercise of his constitutional rights. We note that Defendant raised the issue of sufficiency of the evidence in his statement of issues. However, he did not argue it in his brief in chief and therefore abandoned the issue. *See* Rule 12-318(A)(4) NMRA (providing that an argument in a brief in chief "shall set forth a specific attack on any finding, or the finding shall be deemed conclusive."); *Jones v. Beavers*, 1993-NMCA-100, ¶ 17, 116 N.M. 634, 866 P.2d 362 ("An appellant waives the right of review for sufficiency of the evidence by failing to provide an adequate summary of the relevant evidence to satisfy the appellate briefing rule and related case law."). Villagomez's testimony in any event would have been sufficient evidence to sustain the verdicts. We reverse Defendant's convictions and remand to the district court for

a new trial.

## III.   CONCLUSION

{35}   For the foregoing reasons, we vacate Defendant's convictions and remand to the district court for a new trial.

{36}   **IT IS SO ORDERED.**


_____
                                    **EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**

22