**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2019-NMCA-051

Filing Date: June 24, 2019

NO. A-1-CA-36098

**STATE OF NEW MEXICO,**

     Plaintiff-Appellant,

v.

**GABRIEL ALVARADO,**

     Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Certiorari Denied, August 20, 2019, S-1-SC-37816. Released for Publication September 24, 2019.

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellant

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellee

**OPINION**

**DUFFY, Judge.**

**{1}** The State appeals, pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972), the district court's order suppressing Defendant's written statements, made while he was alone in a room at the police station after he had invoked his right to counsel. We reverse and remand.

**BACKGROUND**

**{2}** Defendant, a certified massage therapist, allegedly penetrated Victim's vagina with his finger during a session. Victim reported the incident to the police later that day. After Victim underwent a sexual assault nurse examiner (SANE) exam the following afternoon that confirmed injury to her vaginal walls and a tear to her labia, the police went to Defendant's home and asked him to come to the station to give a statement. Defendant agreed and drove himself to the station that afternoon. An officer interviewed Defendant in an audio and video-recorded interview room.

**{3}** After some introductory conversation, Defendant made several potentially incriminating statements. The officer advised Defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), after which the following exchange took place:

> Defendant: I would rather speak first with an attorney. Can I do that?
> Officer: That's your—That's your right.
> Defendant: Can I do that right now without going to jail? Can I get an attorney first, get together with you in this same room if we have to, and talk to you?
> Officer: I'm gonna make a phone call . . . and we're going to make a decision on that.

The district court found that that this was an invocation of Defendant's right to an attorney. Defendant and the officer continued talking for about ten more minutes before the officer ended the interview.

**{4}** In that period, Defendant continued to talk with the officer, discussing his religion, family, and a prior conviction. Defendant did not specifically discuss the incident with Victim, and the officer did not ask Defendant questions about the incident. The officer finally ended the interview, saying, "You know what, take a second. Let me take a break. You know, we'll take a break from each other. Give—give me a minute; I gotta run and get something anyway."

**{5}** Defendant asked if he could call his mother with his phone since she might be worrying about him. The officer said, "I'll tell you what, . . . let me run and get something and I'll come—I'll come right back." Defendant asked if he could have a piece of paper and a pen, and the officer said yes and provided them to Defendant. The officer asked Defendant if he had any weapons, briefly searched him, and took his keys. The officer said he would find out if Defendant would be able to call his mother. Defendant began to respond, saying, "That's fine, I'll decide that here in a second, just let me just write down my—" when the officer interrupted, "Take a minute. Think about it. Okay?" as he left the room.

**{6}** Immediately after the officer left the room, it is unclear whether Defendant started writing or whether he only held the pen above the paper. The officer returned briefly to give Defendant his phone and left again. Defendant called his sister, asking her to tell his mother he was okay. About eight minutes after the officer left, Defendant clearly

started writing. He stopped for a while, waved at both of the cameras in the room, then started writing again.

**{7}** About twenty minutes after initially leaving Defendant alone, the officer came back and asked, "So what'd you do with the paper here, just drawing?" Defendant said, "I just kind of needed to bounce ideas off of myself," and "I started writing stuff down and I just started processing mentally." Another officer placed Defendant under arrest, at which time a third individual asked Defendant, "Do you want your notes with you?" Defendant said, "No, sir" as he walked out.

**{8}** Defendant's notes included a page stating, "I tell them everything" connected with a line to "I go to Jail." Another page says, "I have to self destruct[] and that sucks. But that's my own fault. Im [sic] a product of my decisions. So I can handle the results. I must find my way [b]ack to God." Defendant signed this page and drew a picture of a bomb.

**{9}** The State charged Defendant with two counts of second-degree criminal sexual penetration, contrary to NMSA 1978, Section 30-9-11(E)(3) (2009). Defendant moved to suppress all written and oral statements made after he invoked his right to counsel. The district court found that Defendant had invoked his right to counsel when he said, "Can I get an attorney first, then get with you, in this same room if we have to, and talk to you?" and suppressed all statements and written evidence occurring after that point, including the written statements at issue here. The State filed a pretrial appeal challenging the district court's suppression of the written statements. *See* § 39-3-3(B)(2) (permitting the state to appeal "within ten days from a decision or order of a district court suppressing or excluding evidence . . . if the district attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding").

## DISCUSSION

**{10}** The State argues that the district court erred in suppressing Defendant's written statements because they were volunteered. "Appellate review of a motion to suppress presents a mixed question of law and fact. We review factual determinations for substantial evidence and legal determinations de novo." *State v. Paananen*, 2015-NMSC-031, ¶ 10, 357 P.3d 958 (internal quotation marks and citations omitted); *see State v. Pisio*, 1994-NMCA-152, ¶ 17, 119 N.M. 252, 889 P.2d 860 (reviewing de novo the question of whether a statement was "volunteered").

**{11}** "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *State v. Edwards*, 1981-NMCA-119, ¶¶ 12-14, 97 N.M. 141, 637 P.2d 572 (applying *Innis*). "*Miranda* requires that if at any point a defendant invokes the right to counsel by indicating that he wishes to consult with an attorney before speaking or invokes the right to remain silent by indicating that he does not wish to be interrogated, all interrogation must cease." *State v. Madonda*, 2016-NMSC-022, ¶ 17,

375 P.3d 424 (internal quotation marks and citation omitted). However, "[t]he federal constitution does not preclude the use of incriminating statements against the accused if those statements can be characterized as volunteered." *Pisio*, 1994-NMCA-152, ¶ 15. "Volunteered statements of any kind are not barred by the Fifth Amendment[,]" and we have said that "[a] question may qualify as volunteered, even though it is made by one who had previously requested counsel." *Id.* (internal quotation marks and citation omitted); *see id.* ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence[.]" (quoting *Miranda*, 384 U.S. at 478 )). "Most volunteered statements fall into one of two categories: statements which the police have made no attempt to elicit, and statements which respond to a police question or which occur during the course of interrogation, but which are totally unresponsive to the question asked." *Id.* ¶ 16 (quoting 3 William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 27.4(a), at 27-26.6 (2d ed. 1994)).

**{12}**  Our initial inquiry in this case is whether Defendant's written statements were the product of an interrogation or its functional equivalent. *See Edwards*, 1981-NMCA-119, ¶ 12 (stating that the threshold inquiry when a defendant alleges a violation of *Miranda* rights is whether there was an interrogation). "Whether a person is interrogated depends on the facts and circumstances of each case." *State v. Juarez*, 1995-NMCA-085, ¶ 8, 120 N.M. 499, 903 P.2d 241. "Interrogation occurs when an officer subjects an individual to questioning or circumstances which the officer knows or should know are reasonably likely to elicit incriminating responses." *State v. Fekete*, 1995-NMSC-049, ¶ 41, 120 N.M. 290, 901 P.2d 708 (quoting *State v. Cavanaugh*, 1993-NMCA-152, ¶ 5, 116 N.M. 826, 867 P.2d 1208). "The concern of the Court in *Miranda* was that the interrogation environment created by the interplay of interrogation and custody would subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination." *Innis*, 446 U.S. at 299 (internal quotation marks and citation omitted); *see id.* (discussing police practices that do not involve direct questioning but are nevertheless reasonably likely to lead to incriminating statements, such as "the use of line-ups in which a coached witness would pick the defendant as the perpetrator" and other psychological ploys). We too have said that "[i]nterrogation is not limited to express questioning. It can include other, less-assertive police methods that are reasonably likely to lead to incriminating information, but which are beyond those normally attendant to arrest and custody." *Juarez*, 1995-NMCA-085, ¶ 8. "This includes repeated efforts to wear down a suspect's resistance and make the suspect change his mind about invoking the rights described in the *Miranda* warnings." *Madonda*, 2016-NMSC-022, ¶ 19 (alterations, internal quotation marks, and citation omitted).

**{13}**  Defendant contends that the police maintained an interrogation environment even after the officer left the room, and that his written statements must be suppressed because the officer's continued questioning violated the "bright-line rule" that all interrogation must cease after a defendant invokes his right to an attorney. *See id.* ¶ 18 ("[A]ll questioning must cease after an accused requests counsel." (emphasis omitted) (quoting *Smith v. Illinois*, 469 U.S. 91, 98 (1984)). To the extent that the officer continued questioning Defendant after he had invoked his right to counsel, the "bright-line rule" implicates Defendant's responses to that questioning, which are not at issue in

this appeal. *See id.* The interview, however, had ended before Defendant made his written statements, and we find no basis to determine that those statements were made in response to interrogation. *State v. Greene*, 1977-NMSC-111, ¶¶ 26, 28, 91 N.M. 207, 572 P.2d 935 (holding that the defendant's incriminating statements regarding the identification of a body in a newspaper article, after he had been advised of his *Miranda* rights, were volunteered because they were not made in response to police questioning and were the product of choice, rather than compulsion).

**{14}**    The circumstances in this case are substantially similar to *Pisio*, where, after the defendant had invoked his right to counsel, the police ceased questioning the defendant and he sat in silence in the detective's office while the detective completed paperwork. 1994-NMCA-152, ¶ 12. While the officer was "silently completing paperwork[,]" the defendant asked the officer if he would "take the rap" if his alleged rape victim had sex with someone else. *Id.* ¶¶ 12, 18. We rejected the defendant's argument that "even silence on the part of a police officer can be the functional equivalent of direct questioning" and found "no basis for determining that the police should have anticipated [the defendant's] response or that [the defendant] framed the question in response to anything specific the detective had said or done." *Id.* ¶¶ 14, 17. The same conclusion is required here.

**{15}**    In this case, the officer ceased interviewing Defendant and left Defendant alone in the room for approximately twenty minutes, during which time Defendant created his written statements. Like the defendant in *Pisio*, Defendant apparently knew that he was being recorded or observed while alone in the room when he waived to the camera, and he did not make the written statement in response to any questioning or prompting. *See id.* ¶¶ 14, 17 (declining to hold that the defendant was subject to an interrogation when the detective was silent, but "was ready to turn the tape back on if Defendant made a statement with 'evidentiary value' "); *see also Arizona v. Mauro*, 481 U.S. 520, 523-25 (1987) (holding that an accused, who had asserted right to counsel, was not subjected to interrogation or its functional equivalent when police allowed his wife to speak with him in the presence of an officer, who tape-recorded their conversation). There is no indicia of police efforts designed to wear down Defendant's resistance or induce Defendant to make incriminating statements. *See Madonda*, 2016-NMSC-022, ¶¶ 21-24 (holding that the defendant's incriminating statements must be suppressed where right after the defendant invoked his right to counsel, the police "proceeded with techniques they had specifically planned to employ during the interrogation" and "undermined the very warnings which had prompted Defendant to invoke his rights in the first place"). Nor is there any indication that Defendant's time alone was merely a break in a longer, continuing interrogation, as Defendant suggests. Consequently, we find no basis for determining that the officer should have anticipated Defendant's written statements. *See Pisio*, 1994-NMCA-152, ¶ 17. We conclude that Defendant's notes were volunteered statements and hold that the district court erred in suppressing them.

**CONCLUSION**

**{16}** We reverse the portion of the district court's November 10, 2016 order suppressing the written evidence obtained during Defendant's interview on June 18, 2015, and remand for further proceedings consistent with this opinion.

**{17}  IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**KRISTINA BOGARDUS, Judge**